Good morning ladies and gentlemen. Our first case for this morning will be Cynthia Archer v. John Chisholm and others. And Mr. Dillacuil. Thank you, Your Honor. May it please the court, counsel, Your Honors. My name is Mark Dillacuil. You have a low, well-modulated voice. Would you Absolutely, Judge Fowler. I'm Mark Dillacuil and I will be arguing the qualified and absolute immunity issues. My colleague Richard Riley will argue the document custody order issues. But, Your Honor, this is not a case that should have been decided on the pleadings. In the defendants procured and executed a search warrant for Ms. Archer's home that was simply not reviewed by the John Doe judge. Was that in your complaint? It was not in our complaint. We did raise that at the district court hearing and pursuant to this court's decision in Dawson v. General Motors and Janoski v. City of Chicago, we've included allegations about it in our brief in this case. We were dismissed without an opportunity to replead. Had we had an opportunity to replead, we would have added those allegations. Now, the warrant had the stamp. You're not contesting that the warrant in the record was the warrant. We are not contesting that the warrant in the record was the warrant. Okay. And similarly, the affidavit was the affidavit. You're trying to go inside the warrant in the affidavit. We have contested the authenticity of the affidavit. We have no knowledge of the conditions where that was maintained. If this were a normal case, we would have expected it to be on file in the Milwaukee Circuit Court. Because this was a John Doe investigation and there are other indications of procedural irregularity surrounding those documents, including with regard to whether the judge signed it, we do have questions about whether that document is authentic. Should your First Amendment retaliatory investigation claim be limited only to the actions that occurred prior to the issuance of the warrant? Because after that point, the search and investigation was ordered by a neutral judge, and so it was independent of the initial retaliatory motive. We don't think so, Your Honor. As I understand your question, it goes to the issue of absolute immunity and whether or not the defendants were acting in an I think what's called Buckley III, it's that before there's probable cause to arrest, not probable cause to search, which is a different standard. But before there's probable cause to arrest, a prosecutor is not and should not be acting in his capacity as an advocate for the state. Now, there may be some acts before that time, such as the live presentation to a John Doe judge that are immune. But in general, before probable cause to arrest, absolute immunity does not attach. Well, tell me this. I mean, along those lines, does the presence of the judge in the John Doe proceeding I understand your view of the judge, but approving each step of the investigation, does that negate the claim of retaliatory investigation unless you can demonstrate, unless you can demonstrate that the judge also harbored that retaliatory motive? We don't think so, Your Honor. The presence of a judge or a magistrate is not unusual in a criminal investigation. Every search warrant is signed by a judge, and the Supreme Court has held that the judge's participation in signing the search warrant does not break the chain of causation such that you cannot still bring a claim. Now, it may well be that for actions related to that specific legal process, you're judged by the standard in United States v. Leon, the rubber stamp, or that no objective law enforcement officer could reasonably rely on it. It's not quite rubber stamp. It's really, isn't it, whether the signing, using the word magistrate in the broadest sense, a person completely abandoned that person's role as a neutral and detached magistrate. I think that's the language. The language of rubber stamp and neutral detached magistrate are both present in the United States v. Leon case from the Supreme Court. Both concepts are there in that decision, and I think both are close from that decision. And as I see the issue, a neutral and detached magistrate has to actually review the warrant affidavit. But what evidence do we have? I know you have this idea that on that day the travel records didn't seem to work out, but this was a judge who had been working with the John Doe investigation for quite some period of time, and I'm not sure that what you have amounts to evidence that he didn't review it. Sure. Well, I think this is a good opportunity to talk about what we've alleged and what we could allege. Our allegations in this regard are based on payment claims that the John Doe judge made to the Wisconsin Administrative Department. The pay records indicate essentially what he is seeking reimbursement for time-wise, and they're sworn under penalty of perjury. And for virtually all of the days around the warrant execution in early September, mid-September 2011, the John Doe judge said what he was doing. And in some of those days, ending September 10th and resuming September 5th, he put time to this case. And in several of those occasions, he also would put miles, 64 miles, which, as we understand it, is the mileage to and from where he currently resides. On September 13th, 2011, he signed a reimbursement saying he was working as a different matter on that day, and he billed half a day to a different matter. Now, I remember, you have all of this in your briefs. I remember all of this. You're drawing a negative inference that I think is maybe not necessary. I guess I'll just say that. I'm aware of this argument, and I'm aware that you would like to go behind the facial validity of the warrant. And that's, of course, one of the issues in front of us. We'll see what we think. But let me ask you this question. This is a little different. You know, federalism gives us lots of challenges. And one of them is that states are allowed to have their own procedures. And Wisconsin, from time out of mind, has had this John Doe procedure, which I believe is unique in the country. But that's what Wisconsin wants to do, so that's what Wisconsin has done. But what has made me wonder is whether the debate between qualified immunity and absolute immunity actually makes any difference here. Because this is a procedure that's neither fish nor fowl, right? It's done under the supervision of a judge. It looks judicial. It looks a lot like a grand jury proceeding. But on the other hand, the Wisconsin courts repeatedly describe it as an investigatory procedure. So that kind of makes you think of the investigation function that the Supreme Court has described in cases such as Buckley. But in the face of all of this ambiguity and uncertainty, the question that comes to my mind is how one can say that there is clearly established law saying that the prosecutors could not do what they were doing. So in some sense, what I'm asking you is, on these somewhat unusual facts, in the face of this unique procedure, does it even matter, absolute or qualified immunity? Well, Your Honor, I think it does matter. And there is a circuit rule that bars me from citing precedent that's not in the party's briefs. And there's a case that I think gets a little at this called Harris v. Harvey. If you'd like me to file a supplemental brief on Harris v. Harvey, which is a case from this court addressing absolute immunity in the context of a John Doe proceeding, then I would. We also cited Stinson v. Gallagher, a case that was vacated due to a per curiam rehearing on other issues, which suggested that the John Doe judge's opening of an investigation didn't make everything absolutely immune. That case was a little different because it dealt with the activities of witnesses outside of the courtroom, not of attorneys outside of the courtroom. But I would say that there is a decision that needs to be made on how to treat a John Doe. But why does it matter here? I guess what I'm trying to say is if in fact we were to agree with you that there's no absolute immunity for anything, and that's maybe a sweeping statement, but just suppose we agreed with you on that. And then we were applying the very well-established qualified immunity process. Is there a constitutional right? Suppose we agreed with you on that too. But where I'm stuck is how you would get to a finding that it's clearly established that prosecutors operating under the direction of a judicial officer of the state of Wisconsin under this well-established procedure, who are simply investigating in an environment in which the whole concept of damages liability for retaliatory investigation is, to put it mildly, an aggressive theory. I don't know how you get to the second part of the qualified immunity inquiry without saying, well, it's not clearly established. All but the plainly incompetent wouldn't have realized that what they were doing was completely out of bounds. Two points, Your Honor. First, as I understand the clear establishment prong from Saussure, that goes to the contours of Ms. Archer's right. But think of Anderson against Creighton. Yes, of course she has at a very high level of generality all of the rights that you're talking about. But at the granular level, at the level of what exactly happened that you're complaining about that Anderson tells us we need to look at, that's where we need to go. And clearly established has to be understood at that granular level. Well, at the most granular level, Your Honor, of what actually happened, my response would be that that defense is premature. I think that there is a concept that... But nobody's debating the facts. I don't know why it's premature. Okay, then on the face of our pleadings, many of our allegations concerned conduct that was taken outside the presence of a John Doe judge. Some of it entirely... Well, that will always be the case. It would always be the case. But some of it, including leaking secret information to the media, entirely separate from anything that's within a legitimate law enforcement purpose. Does your complaint allege who did that? It does not allege who specifically did that. So we don't know if any of the defendants before us... I think this is a complete list in your brief. Mr. Chisholm, Messrs. Chisholm, Robles, Landgraf, Stetler, Buddy, and Weiss. These are the only defendants? Yes. So we don't know. You haven't alleged. We don't know specifically. I mean, it could have been paralegal. It was. It could be someone under the supervision of Mr. Chisholm. I'd note that Mr. Chisholm is the head of that office, and we allege that he was actively supervising the investigation, and there is supervisory... Think of all the prisoner cases. The prisoners are constantly alleging that something happened and the warden is in charge of the prison, and clearly the warden must be responsible, and we routinely say there's no respondeat superior. I think there's a big difference between respondeat superior liability and supervisor liability. Really? Tell me what you think the difference is. Hypothetically, Your Honor, if I ask my paralegal to go and bring a CD-ROM containing documents to opposing counsel in a case, and he hits a pedestrian in the street, and the pedestrian sues my law firm, we are liable under a respondeat superior theory because the paralegal is my agent. And it doesn't matter that I didn't know. It doesn't matter that I didn't direct him to do that. If I direct my paralegal to go and lie to a judgment debtor to try to get them in a position where they could accept service, or maybe possibly even clearer to this case, I know that my paralegal has lied in similar situations in the past, and I say, you know, you could go call this judgment debtor, try to figure out where they are so we can serve process on them. My liability there wouldn't simply be as a respondeat superior because he's my agent. It would be because I was knowingly participating or turning a blind eye towards their conduct. In this case, our allegations are that the defendants, the prosecutor defendants, were all directly involved in the investigation and were regularly apprised and they knew what was happening. Under that situation, I think we're far closer to the latter situation of supervisor liability, turning a blind eye is the phrase from the cases, than we are to a vicarious liability respondeat superior theory. OK. I mean, I certainly understand the distinction that you're making. So, here's the problem, I suppose. How many people are in that office? Actually, it was five offices, right? Not for the John Doe One investigation. John Doe One is just in Milwaukee. OK, so how many people are in Milwaukee? I'm not certain, but I believe there are something like 40 prosecutors and other non-prosecutor police. Mr. Patoche may be able to give you a more direct answer to that question. So, you can probably see this coming. My issue is a Twombly-Itball issue, where we have six defendants here. You've put an allegation that all six, or one or more of the six, is in this direct command control situation, I'll call it, actually either turning a blind eye to or in a position saying, you know, do this, don't do this. But it seems like it's sheer speculation that any of they were the ones, that they may have known this, that they were doing this, and Twombly-Itball is not often kind to that kind of speculation. Two points, Your Honor. The first is that we've alleged the officials in the investigation, the officials in the office, who we believe were actually involved in this aspect of the investigation. Oh, I'm sure they were. But, I mean, it could be a rogue who leaks this to the press. That's what I'm worried about. Some of the things that you're alleging, surely they must have known. You know, what are they putting in the affidavit that they're putting before the judge? I don't have any problem making the jump that these people had that kind of supervision. But, you know, picking up the phone and calling the Milwaukee Journal sentinel, you know, or the equivalent, you know, leaking it out on social media? Well, Your Honor, Itball and Twombly are about reasonable inferences and plausibility. If you have an investigation... A terribly squishy word, in my opinion. Well, the Supreme Court left the hard work to you. In the context of plausibility, if you've got an investigation where you have an idea of the discreet actors in an office who are involved in that investigation and you know that they have access to that information, that they're the ones who have it day to day, we think it's a reasonable inference to be drawn that the leak would come from those officers not from someone else acting as a rogue agent in the office. What did they have to gain by the leak, though? It seems to me they would be in a much better position. I mean, they wind up getting, in John Doe 1, what is it, six convictions out of that? That's my recollection. Yes. So, you know, I'm not clear why this helps them. If what you think they're doing is using the power of the state to harass allies of Governor Walker and otherwise to misuse those very impressive powers that prosecutors have. Thank you for the opportunity to clarify that because the leaks were a crucial part of the retaliation. Much of the harm that my client suffered was as a result of the public ridicule that she was there. There were radio hosts who were hosting entire programs making fun of her sexual orientation as a result of leaked information that she was involved in the secret investigation. And maybe a step back. When a John Doe proceeding is open, it's not necessarily secret. To be secret, an officer has to go and swear out that a secrecy order is going to benefit the investigation. And one of the ways that it typically benefits the investigation and one of the reasons that my colleagues have said that a John Doe proceeding is superior to others is it provides protection for the accused, for the person under investigation. And that's something that to get a secrecy order you need to swear to. I believe it is even in this record in the appendix the John Doe petition by defendant Landgraf to open the first John Doe investigation swore that and I believe that that was specifically in the context of Operation Freedom Fund and it said that we need to keep this secret it's important for information not to come out to protect the reputations of those involved. Where there's a retaliatory purpose and there's a leak in that context it certainly furthers your purpose. Speaking of those involved, in order to show retaliatory motive, is it enough to show that the investigation is targeting multiple members of the same political views? That may well not be enough but we have much more than that. We have detailed allegations based on a whistleblower from the Milwaukee County District Attorney's Office who was present in the 2010 time frame that this investigation was in fact motivated by a desire to retaliate against Governor Walker and his associates. So, maybe, I see you're going to be in your rebuttal time, but I'll just say I'm very concerned about opening the door to retaliatory investigation claims because we have a lot of political corruption activity in Chicago, not being a stranger to such things itself, but all across the country. And, the purpose of the immunity doctrines has been to allow prosecutors to do their job without fear of this kind of litigation and to trust in other government institutions to cure those abuses that are there, whether it's voting out of office, a district attorney, or whether it's acquittal at a, you know, or, there are many ways that may not be quite as satisfying as damages but they are other ways that we can get at this. And, so, your theory bothers me in that I'm afraid I don't see where you draw the line between anyone who wants to come along with a whistleblower and says, you know, well, they hated Rahm Emanuel and so, you know, we're going to do this in Chicago or somebody else. There are a lot of controversial public officers out there. I think that luckily we have a very good example of what would happen. In the Ninth Circuit has the most liberal standard for retaliatory investigation claims in the country. And that's in cases like the Skoog case we cited, Lacey versus Maricopa County, one of the many cases involving Sheriff Joe Arpaio. And in those, Ninth Circuit, there has not been the proliferation of retaliatory criminal investigation liability cases that you posit. I certainly understand the concern that you want to have a manageable standard and you don't want to open the door to every aggrieved party. But the Ninth Circuit is a big circuit. It could be its own country. And the concern hasn't really come to bear there. And I think this is a pretty unique case. I hope there are not many more like it. I presume you do as well. Thank you. Of course. Thank you. So I think we'll hear next from is it Mr. Rail? Is that how you pronounce your name? It's Riley, Your Honor. Riley. That's obviously not phonetic. May it please the Court. In this appeal, Cynthia Archer also challenges the District Court's order allowing the defendants to contravene an order of the Wisconsin Supreme Court requiring that they file all originals and all copies of certain unlawfully seized materials with the Wisconsin Supreme Court. So here's the thing about this argument. There is certainly from one end of the telescope an inconsistency in that all copies doesn't mean all copies except one that are going to be in the Federal District Court. But on the other hand if you look at the Wisconsin Supreme Court's order, it wants to make sure that zero copies are left in the prosecutors. And the District Court order is going to take care of that. The District Court did not give the prosecutors permission to hold on to anything. Instead if you want to use the language of the Anti-Injunction Act in an effort to preserve its own jurisdiction, it says one copy is going to be filed under seal, under the control of the Federal District Court and otherwise it doesn't say anything about the Wisconsin order. Yes, Your Honor. Well there's two parts to your question. Just as there are really two inquiries here or it can basically be broken down to two inquiries. The first, I think you're asking me whether the Anti-Injunction Act is triggered in the first instance because there might not be a conflict. But then you also mentioned the exception. And if it is, there's the preservation of jurisdiction. So I want to address both. And I think your question actually goes more to the first. But I think the way that you look at an order like this is the way that you're going to look at any other legal document, which is we start with the plain language. On page 60 of the Northwest Reporter Decision, what the Court said was we require that all documents and all electronic data and all copies thereof be submitted under appeal to the clerk of this Court. Now, if the defendants had done what they did in a world without the Eastern District of Wisconsin's order, copying all of the materials, six hard drives worth, they tell us, of materials, and put it somewhere other than where the Wisconsin Supreme Court had told them to put it, they would be liable for contempt in the Wisconsin Supreme Court because they didn't do what the Wisconsin Supreme Court told it to do. And I should add, that's of course the point of the District Court's order in the first instance. If they could do what they did in a world without the order, you wouldn't need the order. So I think it's pretty clear that there's a conflict and it's designed to be a conflict and that's why they asked for it. They understand that. As to whether that relates to necessary in jurisdiction, I think you have to look at what the court's need is. That's the analysis that the Adkins case directs us to in emphasizing that there's a difference between necessity and convenience. Well, and surely in a world where the orders so far from the Wisconsin Supreme Court do not assure one that there will be a record on which the assessing this case, the District Court has ordered a modest and minimally intrusive way of preserving a record. And at the end, again, these things are not in the hands of the prosecutors to the extent that Wisconsin Supreme Court is trying to ensure that there be no further action in this proceeding, nothing the District Court has done hurts that. Well, I respect that the District Court believed it was taking a minimally invasive position here. I respectfully disagree that it is necessary under the N.I. Injunction Act. But you would agree it's minimally invasive. The prosecutors don't have the documents. I don't agree that it's minimally invasive because go back to what the District Court excuse me, the Wisconsin Supreme Court said on page 61 of the Northwest Reporter version and I'm quoting here, the documents and electronic data will not be destroyed. Now, if that is preserved, and on page 52 of the defendant's responsive brief, they concede they tell us that the predicate, the preservation of the materials is sufficient because they concede they still have to go to the Wisconsin Supreme Court for in order to use them under the decision. I see my time is up. They still have to go, they concede, to the Wisconsin Supreme Court for an order under this court's precedent in Socialist Workers Party v. Grubesik and Lucas v. Turner to get an order. So all of that stuff about we lost some motions and we're unhappy about that, well, they still have to go back and make more motions. I don't see how that's relevant. The question is are the documents going to be preserved? The Supreme Court explicitly said that they were. And so the question that's incumbent upon them to answer is that with that predicate established, what else do they need? What's the point of moving it over? You still have to go for the order, the documents are going to be preserved there. This doesn't add anything necessary. It may be convenient, but Adkins tells us that's not enough. Okay. Thank you very much.  Good morning, Your Honor. May it please the Court, my name is John Adkins. I represent the three prosecutors, Mr. Chisholm, Mr. Landgraf, and Mr. Robles, although we're all arguing together on the defendant's side with respect to some of the issues. I want to first address what Mr. Delacroix talked about with respect to these judicial timesheets. There are limits to the notion that you can amend your complaint in your briefs on a motion to dismiss. And to be clear on what's actually in the record about that, these timesheets were not brought up in the motion to dismiss briefs. They were brought up in oral argument, which I don't think you can do. They were not produced. Mr. Delacroix says we were denied the opportunity to replead. They never asked for the opportunity to replead. They certainly could have done that. My guess is, and I can't read their minds, that these timesheets are probably better for them in the abstract than if you actually saw them, because as described today, which is now pretty much the height of what we know about them right here at the podium, they probably say the judge worked on the John Doe case that day. But they're probably not timesheets like a law firm. I don't remember whether any of you ever worked at a law firm. Those are a little more detailed. They're not going to shed any light on... I did at least, although I'm not going to tell you how many years ago it was. Well, they still have them, Your Honor. Let me assure you. And now they're electronic, which is even more annoying. These timesheets are not in this case properly. And without them... Their assertion, as I understand it, though, is that the time for that particular day didn't reflect any work at all in this John Doe case. Well, Your Honor, I'm not sure that gets them where they need to go anyway, because as you pointed out in your question, the issue is not whether the judge was hardworking. The issue is whether he was neutral. And if you take a judge who's not even hearing cases, and you wake him up hearing this case, maybe he's doing probate, but you wake him up at 2.30 in the morning with a search warrant for some drugs, because he's the only judge you can find, and he signs it, and it's never reflected in any record of work at all, it's still a valid warrant. So is there any reason... I mean, I take your point that there's a lot that we don't know about these timesheets. And one of the many questions that crossed my mind about them is whether the judge might have reviewed a draft at some earlier time, whether it's possible telephonically to authorize a warrant. There's some talk about the signature not looking exactly like his in the briefs. It seems like this is late in the day, given that there are legitimate questions you might ask about this. Yes, Your Honor. Late in the day. I guess the late in the day to do almost anything. I would also point out along those lines that, and it's clear from the warrant itself as well as from the arguments that we've made, that this judge had reviewed previous warrants that were incorporated, and had signed previous search warrants, and some of those affidavits were incorporated into this one. So you're not talking about exactly the situation I described, where you wake a judge up at 2.30 in the morning, and he doesn't know anything about the case, and he's really got to find out anything at all. You're talking about a judge who had been working in the investigation for quite a while. There's no reason to believe that he had to spend hours re-reading stuff he had already read. As a matter of fact, that comes to my second point, which is just how involved John Doe judges are in this unique procedural setting. And there again, this is not a judge who they just approached in the hall and said, can you read our search warrant? He's involved not just in search warrants, but he's been involved in the issuance of subpoenas. He's been involved in the taking of any testimony that there is. So this judge knows an awful lot about what's going on in this case. So when a subpoena issues in a John Doe proceeding, is it like a regular subpoena, that the person who is subpoenaed would have an opportunity to file a motion to quash or to modify? Your Honor, I... to be honest, I have to answer that I assume that's correct. I've never heard of a subpoena you couldn't contest in some way. Even grand jury subpoenas can be contested in some way. They don't get contested very often. But I think it would definitely be possible. I mean, because Wisconsin keeps saying in putting this whole set of cases to one side, if you look at what the Wisconsin Supreme Court has said about the John Doe proceedings, they regard them as proceedings that give people better protections than grand juries, not inferior. They do. And one of the strongest protections is the judge, as they say. Because he's there all the way. Now, although I will say, and Mr. Delacroix says, magistrate judges and judges are present all throughout criminal investigations. That's just not right. They are there. And what's important for the purposes of immunity is that, particularly absolute immunity for my clients, the prosecutors, they are present. They're not physically present, but they're there to supervise. They're there to impose consequences if there is misconduct. Refresh my recollection. How do they select a judge to supervise a John Doe? My understanding, which may not be much better than your recollection, is that he is selected by the chief judge of the court in which the petition is filed. That's my recollection from the earlier John Doe case that we had. I think that's how it happens. How does the chief judge become aware of the case? In this case, my clients filed a petition asking for the John Doe to be opened up. The prosecutor? Yes. It doesn't have to be a prosecutor, but in this case... Anybody can walk in and get a John Doe? Anybody can walk in and file a petition, I think. But the judge may... I would hope that the judge would be more receptive when it comes from a prosecutor than from some people, but you never know. A citizen, there have been, if you look at the John Doe cases... As you are aware, I have some background in prosecution. I'm aware of it. I confess that this whole system baffles me. You know, maybe that's why it's unique. Wisconsin has several unique rules. It's one of the reasons... Yeah, they sure do. It's one of the reasons I've never taken a bar exam because of one of Wisconsin's unique rules. But... You were one of those beneficiaries of... The diploma privilege. Yes, ma'am. People have tried to convince me that I've missed something and I've never believed them. Mr. Bertocchi? Yes, ma'am. I don't know how you and Mr. Nutter are going to divide your argument up, but... Let me try this with you. Okay. Why would the reasoning of the government as employer cases be applicable here? That is a Mr. Knott question. Oh, okay. I knew it. I knew it. I know. I'm sorry. I should have delineated. I was going to talk about absolute immunity. Mr. Knott, will you remember that? Remember that question. Okay. But what I... In terms of your immunity, what I wanted to get at is, again, this fish or fowl problem of the John Doe investigation. Because if you look at it as fundamentally a judicial proceeding, since there's a judge who's presiding over it, maybe a simplistic way of characterizing it, but let's do that. Then I can see how everything the prosecutors are doing, going to the judge with their requests for subpoenas, all the rest of it, seems to fit comfortably in the absolute immunity box. But on the other hand, we have word from the Wisconsin Supreme Court that it's an investigatory tool. You don't need probable cause to open it up. Actually, at the end of the day of the John Doe proceeding, you might decide, the judge might decide there is probable cause, at which point an indictment could be returned or other appropriate steps taken. So if you think of it that way, it sounds much more like a qualified immunity. Well, Your Honor, and it could fit there too, but remember the... What you just said is also true of the grand jury. There is no requirement of problem cause to initiate a grand jury proceeding. A grand jury proceeding, actually, probable cause should usually come somewhere toward the end of a grand jury proceeding. An awful lot happens in the grand jury in which you are trying to determine probable cause, and yet it's clear from the Supreme Court's cases, and particularly in light of Rayburg, that a prosecutor is absolutely immune for grand jury activity, this Court's decision in Bianchi, for grand jury activity and preparation for grand jury activity, which has less judicial supervision involved in it than this does. There's a chief judge in most grand jury situations, but he doesn't come to the grand jury to see that. And you're saying your findings had nothing to do with... I mean, this is in some conflict with what Mr. Delacroix is saying, but your view is that the record or the allegations in the complaint, I should say, to be careful, doesn't show any role by the prosecutor defendants in creating the affidavits for warrants or anything of the sort. Those would be typical investigatory actions. Well, except that they are also preparation of documents to be submitted to a judge. And in the Thomas case, this Court talked about seeking warrants being a core prosecutorial function. That's just a little different. The fact that prosecutors are involved in investigating is not the Buckley case. The prosecutors who were supposedly colluding with officers to create fake footprint evidence, if I have that right, the Court pointed out that was months before the grand jury was convened. In this case, you have a judge from the beginning, and they're going to a judge to get the warrant. So yes, I think there is, to be fair to my opponents, I think there is an allegation that at least one of my clients was involved in the preparation of the affidavit. But what he was preparing was a document to be submitted to a judge. Even without the John Doe context, that would be core prosecutorial function. So maybe you could then answer my other question that I asked Mr. Delaquil, which is does it matter here? I mean, suppose we are in the qualified immunity world for at least some of the allegations of this complaint as we may be. What then? It doesn't matter, Your Honor. And it doesn't matter because the judge is under his supervision at every stage of this rather unique proceeding and the operation of that aspect of qualified immunity makes it a lot like absolute immunity. The reason there is absolute immunity in a garden variety case is because once prosecutors begin doing stuff that's court-related, as this court said in Fields 1, as the Supreme Court said in Butts, there's a judge out there. Maybe he's not in the room, but if they do something once they're under his supervision, they can get whacked by the judge. So you don't need civil liability. I would submit that in a John Doe situation, you're like that right from the beginning, both as to the prosecutors and the agents, both because a judge is going to approve what they do and they're going to rely on it, and because the judge is there whether he's in the room or not and can impose consequences on them if they commit misconduct. So of course you're taking a very harsh view, you know, which is that people in the position of Ms. Archer who are subjected to all of these extrajudicial humiliations and publicity and who have this very aggressive execution of the search warrant are utterly without remedy. Your Honor, I don't mean to be harsh, and let me say first that there's no question that having your house searched is not going to be a fun experience. That said, this was not an aggressive execution of a search warrant. This was, even as described by Ms. Archer, a garden variety execution of a search warrant. There is nothing in her description of what happened that is unusual in the context of search warrants, and I've done I've never been on a search because thank goodness they didn't let me go, but I've done lots of search warrants and I'm familiar with what there's no way to make it friendly and pleasant, but everything they did was authorized. So the record shows that this battering ram was present but not used? You come prepared, Your Honor. You come prepared for anything. There were probably great big guns in the officers' cars that were brought but not used. You don't know what you're going to deal with, and the objectives in carrying out a search and they're delineated in our brief are make sure the officers are safe, make sure the evidence isn't tampered with, make sure nobody leaves, and you take whatever you might need. You don't decide well, this is a lady named Cindy Archer so we're not taking our battering ram. But if you don't need it, which they didn't, you don't use it. This is all standard stuff. Finally, Your Honor, I want to address the leak's point that Mr. Delacroix mentioned. There is as he admits, no allegation in the complaint that my clients were involved in it. I don't think it's a fair inference that they were just because Mr. Chisholm runs the office. I don't think there is a distinction as he describes it between respondeat superior and supervisory liability. They sound a lot like it. And I would also note, and I think this is in the record somewhere, that my clients, at least one of them, opposed the release of John Doe 1 information when one of the newspapers filed a request to not release it. They didn't have any interest in getting this leaked. Unfortunately, when someone's house is searched, it usually attracts attention. People find out about it. If there's nothing further, I'll turn it over to Mr. Knott. All right. Thank you. Mr. Knott, please. And I take it you are representing the police investigators, right? That's correct, Your Honor. May it please the court, my name is Doug Knott. I represent David Buddy, Robert Stelter, Aaron Weiss, who are investigators with the Milwaukee County District Attorney's Office. They are each have had long careers in law enforcement. And I do intend to respond to what Mr. Delacroix has said about the First Amendment retaliation claim, but I'd just like to point out, because we're talking about the extent of the pleadings somewhat, that the sum total of the allegations pertaining to those investigators, per the complaint, as to their political animus and why they might be devoted or motivated to drop their professionalism and campaign against Ms. Archer. The sum paragraph, or the sum total of those allegations are in two paragraphs. One is an allegation that on information and belief, the investigators share Mr. Chisholm's, the DA's, political convictions on information and belief. The second allegation of political animus pertaining to my clients in the amended complaint is an allegation that Mr. Buddy had a yard sign, a recall walker yard sign. Both the allegations were actually denied because not all of the investigators share the political affiliation and the allegation pertaining to yard sign pertain to a different family member rather than Mr. Buddy. So that's the entire sum of the factual basis that's been pled to suggest animus. Uh... Could you answer my question as to why the reasoning of the government as employer cases would be applicable here because of the district court dismissed the claim based on a line of cases? Yes, Your Honor. What the district court determined was that it was uncertain as well as other uncertainties about the existence of the First Amendment retaliation claim determined also that the Garcetti case and the Garcetti doctrine makes it uncertain whether Ms. Archer's activity was protected speech under Garcetti. This court... So you're saying not quite that he said that Garcetti does apply but that it wasn't clear whether it applies. Is that right? It would take a close reading of Judge Edelman's decision. I believe he says initially citing this court that it may not... He discusses the doctrine. The question is whether the speech was of political concern and public concern and whether it was arises out of her employment. And then Judge Edelman said we don't have to decide that issue because the uncertainty under the existing law is another factor that weighs in favor of qualified immunity for my clients because the contour of the First Amendment right in Ms. Archer's circumstance is not clearly defined. This is page 30 and 31 of his opinion you're referring to where he says it is unclear whether Garcetti's holding that speech made pursuant to a public employee's official duties is unprotected applies in this context. And then he goes on and cites a bunch of cases and says I need not resolve the issue even assuming that Garcetti does not apply and plaintiff's speech was protected the proposition was not clearly established at the time of the alleged violation. That's correct. And the basis for Judge Edelman saying that is two cases within this circuit, your decisions in Fairley and Abakarian where the court identified the issue noted the language in Garcetti that says employees speaking pursuant to their official duties do not speak as citizens for purposes of the First Amendment. So the suggestion would be that the focus is on the language and the purpose of the speech rather than the relationship between the alleged retaliator and the speaker. If the U.S. Attorney's Office decided that it would pursue investigations only against persons who were registered Democrats or only against registered Republicans is it your position that there would be no First Amendment violation as long as there was probable cause as to those persons investigated? Correct, your honor. That is your position. Correct. The right to bring a constitutional claim for retaliatory investigation has not been clearly defined. And if that were to be clearly defined, our position would be that the existence or the absence of probable cause would have to be an element of that claim. Even if the protections of the criminal process are in place in the form of probable cause. You do not see a distinct injury to the First Amendment interests and fundamental values of free speech in that scenario. Wouldn't that have the effect of discouraging people from affiliating themselves with the targeted party? And isn't that precisely the danger that the First Amendment addresses? I agree, your honor, that it could have a propensity to chill speech. What the court has decided in the context of law enforcement is that the prosecutors and investigators need leeway to do their jobs. Isn't the question how much leeway? It is. In the context of retaliatory prosecution, retaliatory address, the absence of probable cause creates an objective measure. The problem is the slippery slope. If we get into a claim of retaliatory investigation that could proceed in the absence of probable cause, where does it stop? If there's an accident on a corner, a crime on a corner, and I proceed to knock on a door and ask whether there are any witnesses inside, if I ask later if I could interview that witness again, the witness becomes concerned, hires an attorney, feels very put upon, worried about why we're asking these questions. Have we entered a place where that claim, that witness has a right of a constitutional right to sue the prosecutor for that involvement? And I think that the element of probable cause, as was present here, needs to be, needs to inoculate the prosecutors and investigators so that they can do their job. So it's my recollection that there have been occasional cases in maybe an analogous area, that is to say racial profiling, say of stopping drivers on a highway or what have you. And it's my further recollection that in those cases the courts have held that if there was probable cause to stop the car, in a sense, the fact that there was also this unlawful motivation doesn't inoculate the person against being stopped. If they were driving 80 miles an hour, they were driving 80 miles an hour, no matter whether there is this impermissible racial element. But I don't, I'm not sure that that's right, number one. I would want to go back and look at those cases, but I think probable cause is used in the way that you are arguing for in those cases. That's my understanding as well in the context of the Fourth Amendment. The point is that the contours of that right with respect to a First Amendment claim have not been established. So would you concede that maybe there is a valid First Amendment argument, but it's just not clearly enough established to support liability here? No, Your Honor. And the reason why is because, as you were saying, the contour of the right has to be defined at a high level of specificity. And as you said, this John Doe mechanism is neither fair nor foul. It's its own animal. And we believe that any definition of the right here would have to include, it would have to be defined as a right to be free of a search warrant that was issued in the context of a John Doe judge, of a John Doe prosecution by a judge and supported with probable cause. There's no case anywhere that is held under analogous facts that there is a claim of retaliatory investigation. The Supreme Court in 2006 expressed doubt about whether there is, in fact, that cause of action. In Hartman v. Moore, it said, no one here claims that simply conducting a retaliatory investigation with a view to promote a prosecution is a constitutional tort. And whether the expense or other adverse consequences of a retaliatory investigation would ever justify recognizing such an investigation as a distinct constitutional violation is not before us. Do you think that putting federal law to one side, that the retaliatory investigation, let's assume we know it when we see it and there was one, would support a state law claim for malicious prosecution? In the state of Wisconsin, the absence of probable cause is an element, a necessary element of the claim, of the malicious prosecution claim. So I don't believe, under the facts of this case, that it would be supported. How important for our purposes is it to accept the district judge's decision to look at the search warrant and the supporting affidavit? There's some argument, of course, that he shouldn't have done that. The decisions of this court have said that you are free to examine those documents integral and referenced in the complaint. And not only that, but that the exhibits trump the allegations characterizing the exhibits in the complaint. So I think it's very important. The extent to which Judge Adelman actually relied on the documents themselves is a little unclear, but I think exercising the right to go ahead and examine those attached documents, the presence of probable cause is very clear. So your opponents argue that, actually worse than mistakes, there are actually misrepresentations in the affidavit supporting the warrant. What, if anything, should we do about that? I mean, for example, they say she was actually an opponent of that second I think that was the housekeeping proposal, whichever it was. She was an opponent to the second one, and so why would she ever have been trying to bring it about? Your Honor, my understanding is that those type of arguments that additional facts could have been shared, or that I have an explanation for what you put in that affidavit, that that doesn't negate probable cause. And that under the case law, the subjective intent of the investigators is irrelevant to the qualified immunity analysis. So that judge, having determined that there's probable cause for issuing a search warrant, immunizes the investigators from any claim. Furthermore, Your Honor, and Judge Edelman's examination of the search warrant and affidavit can lead to the same conclusion. Briefly, with respect to the preservation document, Your Honor, you're absolutely correct that this was a necessary balance and an attempt to protect these litigants against what most certainly would be a loss of access to the documents. We have no faith, as do the plaintiffs, that the Supreme Court would ever grant access to these documents. Mr. Ryle cited a portion of the Supreme Court decision where he said that the documents would not be destroyed. Well, that's actually the sentence that says the documents would not be destroyed during the pendency of the petition to the Supreme Court. The next sentence says they could also potentially be available for use in related civil proceedings if there is a request and a determination that such use is proper under the circumstances. That potentially available is not very reassuring that the Supreme Court intends to keep the documents. Once again, we've made multiple applications to advise the Supreme Court of the existence of this litigation and our need and have been denied access. All right. Thank you very much. Thank you. Anything further, Mr. Delaquil? Just a few points, Your Honor. First, I know we've heard a lot about the timesheets. One factual clarification about what we alleged. We alleged that the timesheets showed that the John Doe judge worked on a different matter on September 13, 2011, the day that the warrant application was submitted and that the warrant was purportedly signed by the judge and that the records do not indicate he worked on the John Doe case that matter. They were signed under penalty of perjury and free work may well be a violation of the State Anti-Deficiency Act. Second, about whether we've somehow sandbagged the court or the parties by bringing them in at the introducing our allegations at the district court argument and including them in our brief here, I'd again refer this court to the case in Dawson v. General Motors Corp. 977 F. 2nd 369, which is very clear that we are allowed under court rules to give an unsubstantiated factual account to show why a case ought not to have dismissed. We're not required under this court's rules to seek to leave to amend in the district court. There are circuits that have rules like that, but this is not one of them. Third, on the affidavits, there's some idea that we referred to all of the affidavits that the judge considered in our complaint and that's not true. In fact, the longest affidavit, the July 11 affidavit, we didn't refer to at all and we attached it to their motion for judgment on the pleadings. All of these documents are facially incomplete. They incorporate or purport to incorporate a variety of other documents that are not before this court. Those incorporations are in A405, A415, A423, A517, A564. If this were trial, I could move for a complete record under Rule 106 and it would be dismissed unless. And finally, about a few things that Mr. Knott said. I think the implications of the defendant's case were made clear. Under his theory, a public employee, by virtue of the fact that he is a public employee and speaking in the scope of his duties, would have no protection from a criminal investigation by a law enforcement officer who disagreed with him. I understand the need of an employer to ensure that employees are performing effectively, but that's not what the Supreme Court meant in Garcetti. Okay. You need to wrap up. Thank you very much. Thanks to all counsel. We will take this case under advisement.